IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-03246-MEH

JAMES A. JOE,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff James A. Joe appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C § 423, and supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.[1]  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **affirms in part and reverses in part** the Administrative Law Judge's decision, **and remands** the Commissioner's final order.

---

[1] In Plaintiff's "Statement of Jurisdiction" he requests review of only the denial of the DIB claim.  Opening Brief, docket #13 at 15-16.  However, he cites both titles of the Social Security Act and proceeds as if he is appealing the denial of both the DIB and SSI claims.  [*Id.*]

## BACKGROUND

### I.   Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his application for

DIB and SSI benefits filed on October 29, 2009.  [AR 250, 252]  After the application was

initially denied on June 9, 2010 [AR 139], an Administrative Law Judge ("ALJ") held a hearing

on Plaintiff's request on January 14, 2011.  [AR 70]  On March 28, 2011, the ALJ issued an

unfavorable decision for Plaintiff, finding that Plaintiff was not disabled because, considering the

musculoskeletal listings and the mental impairment listing, Plaintiff did not have an impairment

or a combination of impairments that meets or medically equals one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1.  [AR 116-128]; 20 C.F.R. Part 404, Subpart P, App.

1.  Further, the ALJ found Plaintiff not disabled because, considering Plaintiff's age, education,

work experience and residual functional capacity, there were jobs existing in significant numbers

in the national economy that Plaintiff could perform.  [AR 116-128]

On April 21, 2011, Plaintiff requested review of the decision from the SSA.  [AR 190]

On November 25, 2011, the SSA Appeals Council remanded the decision under the substantial

evidence and material evidence provisions of the SSA regulations (20 C.F.R. §§ 404.970 and

416.1470) in order for an ALJ to more closely examine Plaintiff's maximum residual functional

capacity ("RFC") and to consider new medical evidence.  [AR 135]  A hearing was held on

March 15, 2012 [AR 39], and on April 12, 2012 the ALJ found that Plaintiff was not disabled

prior to March 3, 2011, but became disabled on that date.  [AR 32]

On May 3, 2012, Plaintiff appealed the ALJ's April 12 decision.  [AR 248]  The SSA

Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's

determination, making the SSA Commissioner's denial final for the purpose of judicial review

[AR 1-3].  *See* 20 C.F.R. § 416.1481 and 20 C.F.R. § 404.981.  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on May 6, 1958; he was 51 years old when he filed his application for SSI and DIB on October 29, 2009.  [AR 250-254]  Plaintiff claims he became disabled on October 27, 2009 [AR 252] and reported that he was limited in his ability to work by "[c]linical depression, problems with back, knees, shoulders, neck and hands, high blood pressure, heartburn and [Barrett's] esophagus, arthritis in hips, foot problems, headaches."  [AR 280]

### A.    Physical Conditions

As to Barrett's esophagus, Plaintiff had an esophogogastroduodenoscopy performed, finding severe distal erosive esophagitis and two centimeters of Barrett's esophagus that was biopsied along with mild antral gastritis.  [AR 356]  The biopsy revealed intestinal metaplasia of squamoglandular mucosa.  [AP 359]

Plaintiff was consistently taking Loterel for high blood pressure, Ibuprofen for arthritis, and Prevacid and Ranitidine for heartburn. [AR 535, 538, 551, 627, 640]

On December 10, 2007, Plaintiff had right shoulder arthroscopy with debridement of biceps tendon and arthroscopic subacrimonial decompression with arthroscopic rotator cuff repair.  [AP 336]  Plaintiff further had arthroscopy of the right shoulder with repeat arthroscopic rotator cuff repair and arthroscopic biceps tendodesis.  [*Id*.]  The record shows that Plaintiff has had left shoulder arthroscopy.  [*Id*.]

A radiology report dated July 21, 2008 noted that Plaintiff was found to have mild patellofemoral joint osteoarthritic changes in his right knee.  [AR 345]  Regarding his lumbar spine, Plaintiff was shown to have multilevel disk and facet degenerative changes most

prominent at L5-S1 along with asymmetric degenerative changes of the inferior right SI joint. [AR 345-346]

On August 15, 2008, Plaintiff received a C6-7 interlaminar epidural steroid injection for cervical spinal stenosis and severe neck pain.  [AR 394]   He received additional C6-7 interlaminar epidural steroid injections on August 29 and September 12, 2008.  [AR 388, 391] The doctor noted that Plaintiff "had made some progress, in that he is only rarely having paresthesias in his right hand and not any in his left hand. He is not having any radiation to his upper extremities other than that. He is having neck pain and headaches that persist." [AR 388]

On January 28, 2009, Plaintiff was seen for an evaluation of fasciitis, equinus and heel pain. [AR 340]  The doctor noted that "[c]linically, the tendon Achilles is still tight. He still has pain at the plantar fascial region and also the tendon Achilles region."  [*Id.*]  On May 27, 2009, Plaintiff was seen for an evaluation of bilateral knee pain and was diagnosed with left and right knee pain with patellofemoral arthritis.  [AR 338]  Plaintiff's neck pain and occipital headaches reportedly dissipated, but on May 29, 2009 Plaintiff again received an interlaminar epidural steroid injection and bilateral occipital nerve blocks due to renewed pain.  [AR 385]  On July 7, 2009, Plaintiff was evaluated for right shoulder discomfort which lead to him being awakened at night once every week or two.  [AR 336]  The physical examination showed that the incisions from right shoulder arthroscopy were well-healed with no signs of infection and Plaintiff had ninety percent of normal motions of the right shoulder with no localized motor defects.  [AR 337]  The doctor also noted that motion of the cervical spine did not cause radicular symptoms into the arms.  [*Id.*]

On July 17, 2009, Plaintiff again received bilateral occipital nerve blocks, as well as

trigger point injections five times in his left trapezius and two times in his neck strap muscles for a relapse of pain, and was noted to have significant occipital headaches and myofascial pain in his neck and left trapezius area.  [AR 379]  On April 8, 2010, Plaintiff completed a "Consultative Exam" from Dr. Charlene E. Borja in which the results stated "chronic right shoulder pain, bilateral foot pain, knee pain, depression—stable, bilateral hip pain—stable, musculoskeletal headache, and Barrett's esophagus—stable."  [AR 361-367]

In May, June, and July of 2010, Plaintiff had a variety of tests and MRIs done for spine and nerve-related issues.  [AR 425-439]  An MRI of his cervical spine revealed degenerative anterolisthesis of C4 on C5, and degenerative changes at C3-4-5-6.  [AR 438]  An MRI on June 6, 2010 showed multilevel changes to the lumbar spine including moderate narrowing of the bilateral L5 nerve foramina.  [AR 435-436]  On June 25, 2010, Plaintiff underwent an MRI specifically of the spine sacrum that revealed nonspecific abnormal edema of the right sacroiliac joint with an abnormal decreased signal in the marrow on both sides of the right sacroiliac joint. [AR 432-433] On September 6, 2010, Plaintiff was admitted to the Memorial Hospital emergency room with a complaint of neck pain.  [AR 423]  The doctor noted that "[t]he patient may very well have discogenic disease. However, there is nothing about this particular episode that appears discogenic; it is all muscular."  [*Id.*]  Plaintiff was given a prescription of Percocet, Robaxin, and Ibuprofen.  [AR 424]

On October 8, 2010, Plaintiff visited University Hospital describing lower back pain, significantly worse over the last two-to-three years, centrally located and radiating bilaterally. [AR 602]  The pain occurred consistently, five-out-of-ten, worsening with movement or sitting. [*Id.*] Plaintiff described the pain as burning and radiating from the back to the front of the thigh. [*Id.*]  He described intermittent numbness of his feet.  [*Id.*]  Plaintiff was assigned with

lumbosacral disc degeneration and a herniated lumbar disc.  [AR 604]  A radiology report the same day found moderate to severe multilevel degenerative lumbar spondylosis.  [AR 608]

On October 14, 2010, a CT scan of the lumbar spine revealed L5-S1 degenerative changes with significant foraminal stenosis, a suspected L-4-5 disc protrusion, and right sacroiliac joint sclerosis.  [AR 420]  On October 18, 2010, Plaintiff had an initial physical therapy evaluation from Quality Rehab.  [AR 415]  He stated that his pain was a seven-out-of-ten for "low back pain down to thigh."  [*Id*.]  From October 18, 2010 to December 1, 2010, Plaintiff continued doing physical therapy.  [AR 396-414]

On November 2, 2010 during a follow-up for a CT scan from October 14, 2010, it was noted that "radiologic studies including MRI, CT scan, and [X]-rays show significant disk degeneration at L5-S1 with bony encroachment on the bilateral foramina.  [Plaintiff] also has disk herniation at L4-5 with far lateral nerve root compression on the left greater than on the right, although the right also has a far lateral disk.  The patient also has some compression of the cord centrally at L4-5."  [AR 585]  Further, Plaintiff was referred to Dr. Christopher Cain for a surgical evaluation, stating that he "will probably need a two level fusion with decompression, foraminotomies, and laminectomies."  [*Id*.]  On November 19, 2010, the Plaintiff's primary care physician, Dr. Patrick Higgins, performed a "Revised medical assessment of ability to do work-related activities."  [AR 440]  Dr. Higgins noted that Plaintiff could never lift or carry above ten pounds, would only be able to sit, stand, or walk for one hour during an eight hour workday, and that the plaintiff did not retain the ability to hear and understand simple oral instructions, nor communicate simple information.  [AR 440-444]  Further, Dr. Higgins noted that Plaintiff could care for his personal hygiene, but could not perform activities like shopping, could not prepare a simple meal for himself, and could not travel without a companion for assistance.  [*Id*.]  Dr.

Higgins identified an MRI as the particular medical or clinical finding which supported his assessment under the "Sitting/Standing/Walking" section of the form. [*Id.*] In all other places, there was nothing noted under medical or clinical findings. [*Id.*] In a "Functional capacity evaluation (mental)," Dr. Higgins marked "Extreme," meaning "[s]evere limitations in this area. No useful ability to function in this area" under all categories of "understanding and memory." [AR 445] All other categories were "Marked," meaning "[s]erious limitations in this area. The ability to function in this area is severely limited but not precluded." [*Id.*]

On December 8, 2010, Plaintiff received a discogram. [AR 567] During a follow-up for the discogram on January 26, 2011, Plaintiff was shown to have "significant disk degeneration at L5-S1 with some degeneration at L3-4 and L4-5." [AR 565] Injection x-rays showed that Plaintiff had annular tears at all three levels. [*Id.*] Plaintiff stated that he had twelve-out-of-ten pain concordant at L3-4 and L4-5, and also had pain of eight-out-of-ten pain, which was atypical with injection, at L5-S1. [*Id.*] Plaintiff discussed options for surgery and was notified that the decision was completely his own because he was the only one who knew how much pain he had. [*Id.*] Plaintiff elected for surgery. [*Id.*]

On March 3, 2011, under the diagnosis of low back pain, lumbar disk displacement, lumbar disc degeneration, lumbar foraminal stenosis, and lumbar spondylosis, Plaintiff underwent anterior spinal fusion surgery of L3-5, performed by Dr. Cain at University Hospital. [AR 474] Plaintiff was given a prescription of Percocet, Oxycodone and Senna upon discharge. [AR 643] On March 18, 2011, Plaintiff stated during a follow-up to the surgery that he is "in some ways better, in some ways worse." [AR 639]

On April 17, 2011, Plaintiff visited Memorial Hospital because he ran out of back pain medication. [AR 706] Plaintiff received an intramuscular shot of Dilaudid and was given a

clinical impression of acute exacerbation of chronic back pain.  [*Id.*]  On April 28, 2011, Plaintiff

revisited Memorial Hospital, stating that he again ran out of his prescription.  [AR 702-703]  The

physician seeing him noted:

> Certainly, he does have reason for new pain. He does need to be following up
> with his doctor and be more vigil about following up with his medication
> regimen. In addition, he really should be following up with his doctor during the
> daytime hours instead of waiting until nighttime to come to the hospital for this
> kind of discomfort. He understands this. I have given him an injection of Dilaudid
> 1 mg Intramuscular (IM) and a prescription for 12 Percocet to help tide him over.

[*Id.*]  On May 3, 2011, Dr. Cain stated that Plaintiff's back pain was "related to the endplate

failure at L3," but he expected that the symptoms would settle as healing progressed.  [AR 626]

On May 10, 2011, Plaintiff again revisited Memorial Hospital and was denied a prescription for

stronger pain medication, with the doctor explaining that:

> He needs to discuss that with his own primary care physician and Dr. Kane [sic]
> at University Hospital. He tells me that he is taking the pain medicine exactly as
> directed, he is not sure why he ran out…I told him that we would give him an
> injection here. I will give him a couple pills to take home and then I will write
> him a very small prescription, for which he can pay cash for while he is waiting
> for his next refill. The patient was somewhat upset by this. He wants me to give
> him a separate prescription for OxyContin, but I do not feel comfortable doing
> this now.

[AR 699]  The doctor gave a clinical impression of an acute laceration of chronic back pain.

[*Id.*]  From July 14, 2011 to March 1, 2012, Plaintiff restarted physical therapy related to back

pain.  [AR 730-754]

B.   Mental Conditions

As to clinical depression, Plaintiff stated in the "Consultative Exam Report" performed

by Dr. Borja on April 8, 2010 that he had depression and has had two suicide attempts in the

past.  [AR 362]  Dr. Borja noted that Plaintiff "is currently seeing a counselor and is taking

medication, for which he feels that his symptoms are well controlled."  [*Id.*]  Plaintiff was taking

30 mg of Cymbalta at the time of the exam.  [AR 363]  Plaintiff continued to stay on Cymbalta throughout the length of his applications and appeals. [AR 538, 551, 579, 627, 640]   On February 23, 2011, Plaintiff was "doing well on this."  [AR 539]

### III.   Hearing Testimony

On January 14, 2011, Plaintiff and his counsel timely appeared and vocational expert Doris Shriver testified.  [AR 70-85]  Plaintiff stated that lifting things and reaching was difficult and that his right shoulder "lock[ed] up" on him.  [AR 74]  Plaintiff explained that he had torn his rotator cuff twice, the last time being December of 2007, when he was operating a tow truck. [*Id*.]  He commented that this was the last place he worked.  [*Id*.]  Plaintiff continued, stating that he had arthritis in both his knees, that he used a cane, and "really [could not] do a lot of walking anymore."  [AR 75-76]

Regarding his back, Plaintiff noted that his pain was an eight-out-of-ten at least three times a week, and that after a variety of therapies including injections, core strengthening, massage therapy, acupuncture, and decompression therapy, only acupuncture helped "and even that didn't last long."  [AR 77]  Regarding his neck, Plaintiff said that he has a bulging disk and that "if he turned his head, it would cause a shooting pain that went up into his forehead and eyes."  [AR 78]  Plaintiff stated that a series of injections into his neck would help him for seven or eight months.  [AR 79]  Plaintiff stated that he had arthritis in both his hands, that they fell asleep all the time, and that he had trouble holding his cane.  [AR 79-80]  He stated that he also had arthritis in both of his feet.  [AR 81]

After confirming that she had reviewed the vocational exhibits in the file and that she was familiar with the industries of the region of Colorado, Ms. Shriver gave the exertional and skill levels involved in Plaintiff's past work.  [AR 82]  Ms. Shriver stated that Plaintiff's work as a

building maintenance repairer was medium work with a Specific Vocational Preparation ("SVP") of seven, his work as a tow truck operator as medium work with an SVP of three, and his work as a dispatcher for tow trucks as sedentary work with an SVP of five. [*Id*.]  Based on the ALJ's hypothetical which explained Plaintiff's alleged conditions, Ms. Shriver concluded that Plaintiff could not do any of his past work, but that a light truck driver, brake adjuster, and housekeeping-cleaner could be compatible. [AR 83]  The ALJ proffered a second hypothetical in which an additional limitation as testified to by Plaintiff was added stating that pain would not allow Plaintiff to be at the workplace once a week. [AR 84]  Ms. Shriver stated that would not be tolerated in competitive employment. [*Id*.]  Plaintiff's attorney confirmed with Ms. Shriver that under the second hypothetical, all jobs would be eliminated. [*Id*.]  An unfavorable decision was rendered against Plaintiff on March 28, 2011. [AR 116]  On April 21, 2011, Plaintiff requested review of the decision from the SSA. [AR 190]

On November 25, 2011, the SSA Appeals Council remanded the decision and a new hearing was held on March 15, 2012. [AR 39, 135]  Plaintiff and his counsel timely appeared and vocational expert Doris Shriver testified. [AR 41]  Plaintiff first stated that since his spinal fusion surgery on March 3, 2011, his back was worse than it was before the surgery. [AR 44]  Plaintiff mentioned that he had sharp knee pain that "comes and goes" and that the back pain was constant. [AR 47]  When Plaintiff's attorney attempted to discuss Plaintiff's ability to lift before and after the surgery, the ALJ responded that "No, we won't talk about before the surgery. We've already talked about that. You may not have been here, but [Plaintiff] and I were." [AR 49]  Plaintiff then explained that since the surgery, he could lift about ten pounds in one hand. [*Id*.]  Plaintiff continued that his motion was limited, he had trouble doing chores, could not sit or stand for an extended amount of time, and had to change positions often. [AR 49-55]

Plaintiff explained that he was "always uncomfortable," and that he was only taking Ibuprofen at the time because his doctor did not like to prescribe narcotics and that Plaintiff did not like to take them because they made him forgetful and light-headed.  [AR 55]  Plaintiff stated that he was taking Cymbalta for depression, which did not alleviate his depression altogether and that "[i]t's not as bad as it used to be, but it still comes and goes."  [AR 56]  Plaintiff further said that his depression made it difficult to be around people about three or four times a month, was not connected to the weather and was "probably" connected to his physical pain.  [AR 57]  Plaintiff further explained that he probably had two good days a week in which he could sit up longer and "maybe play some games on the computer," but could not go for a long walk or ride a bike.  [AR 58]

After confirming that she had reviewed the vocational exhibits in the file and that she was familiar with the industries of the region of Colorado, Ms. Shriver confirmed from the prior hearing that a person with similar physical characteristics as Plaintiff could work as a brake adjuster or a housekeeper-cleaner.  [AR 61-62]  The ALJ then proffered that the hypothetical person had the limitation of only occasional dealing with the general public, in addition to the characteristics presented in the first hypothetical.  [AR 62]  Ms. Shriver stated that the potential jobs would still be viable, but when asked to consider additionally the ability to do on-task work activities for only five-to-fifteen minutes per day or per hour without needing a break, Ms. Shriver found this to be incompatible with any employment.  [AR 63]

Plaintiff's attorney then questioned Ms. Shriver, asking "if the individual required a sit-stand option at will and were only able to carry ten pounds with the left non-dominant hand while standing and walking due to the use of the cane, would that still allow for those jobs that you gave in your hypothetical?"  [AR 63]  Ms. Shriver responded that they would not.  [*Id.*]  Ms.

Shriver suggested that the job of toll booth operator would require light work that Plaintiff could do only with the ability to carry ten pounds with his left hand and that would require not more than occasional interaction with the general public.  [AR 65]  However, Ms. Shriver explained that the toll booth operator job would not stand if there was any interaction with the general public more than a third of the day, and that no other jobs would fit that hypothetical.  [AR 68]

On April 12, 2012, the ALJ found that Plaintiff was not disabled prior to March 3, 2011, but became disabled on that date.  [AR 32]  On May 3, 2012, Plaintiff appealed the ALJ's April 12 decision.  [AR 248]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-3]

## LEGAL STANDARDS

### I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to

show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. § 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed RFC prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the

conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

Because the second hearing occurred on remand from the SSA Appeals Council to more closely examine the Plaintiff's RFC and to consider new medical evidence, the ALJ considered two timeframes: the first was Plaintiff's alleged onset date of his disability (October 27, 2009), and the second was the established onset date of disability (March 3, 2011), which was newly considered for the second hearing.  [AR 25]  The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability (Step One).  [*Id.*] Further, the ALJ determined that since the alleged onset date of disability, Plaintiff had the following severe impairments: disorder of the lumbar and cervical spine, bilateral knee patellofemoral arthritis, status post shoulder surgery, and affective disorder.  [*Id.*]  The ALJ also ruled that since the established onset date of disability, March 3, 2011, Plaintiff had the additional severe impairment of status post back surgery (Step Two).  [*Id.*]  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment since the alleged onset date of disability, but that Plaintiff in actuality became disabled on March 3, 2011 (Step Three).  [AR 25, 32]

The ALJ then determined that prior to March 3, 2011 Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he could only occasionally perform overhead reaching, could frequently perform handling and fingering, should be allowed the use of a cane to ambulate, could not use foot or leg controls, would be subject to occasional postural limitations in bending, kneeling and climbing, could perform work at an SVP of three or less, and could only occasionally deal with the general public.  [AR 26] The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to March 3, 2011, to the extent they are inconsistent with the [RFC] assessment."  [AR 27]

The ALJ gave no weight to opinion evidence from Plaintiff's treating provider, Dr. Higgins, because "the severity of the limitations espoused by Dr. Higgins would indicate that [Plaintiff] was bedridden, which he is not."  [AR 28]   The ALJ explained that Dr. Higgins' "physical assessments were contrary to the objective medical evidence of record and [Plaintiff's] own self-reports of his capabilities" and regarding a mental assessment, "the extreme limitations cited by Dr. Higgins would require hospitalization and [Plaintiff] has not been hospitalized. Dr. Higgins is not a mental health provider or specialist, nor did he provide any substantiation for his opinions."  [*Id.*]

The ALJ gave little weight to Dr. Borja's opinion during a consultative physical examination because Plaintiff had "a fairly active lifestyle and the limitations suggested by Dr. Borja are not borne out by the longitudinal medical history of [Plaintiff]."   [AR 29] Additionally, the ALJ gave partial weight to Dr. Anthony LoGalbo, a non-examining medical source, agreeing in part that Plaintiff "could perform work within a light exertional range and that overhead reaching should be limited to occasional."  [*Id.*]  However, the ALJ disagreed with

Dr. LaGalbo's assessment that Plaintiff "would be unlimited in his ability to use foot and leg controls given the arthritis in his knees and the fasciitis in his feet." [*Id.*]   Finally, the ALJ considered Dr. Kelley Rumbyrt's completion of a mental RFC assessment at the behest of the State agency. [*Id.*] Dr. Rumbyrt stated that Plaintiff was capable of work of limited complexity and could not work closely with supervisors or coworkers, but could accept supervision and relate to coworkers if contact was not frequent or prolonged. [*Id.*] The ALJ found that Dr. Rumbryt's opinion was reflective of Plaintiff's self-reports, but was not supported by objective medical evidence. [*Id.*] Many of these findings were verbatim from the first hearing decision on March 28, 2011. [AR 116-133]

Beginning on March 3, 2011, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that Plaintiff could only occasionally perform overhead reaching, could frequently perform handling and fingering, should be allowed the use of a cane to ambulate, could not use foot or leg controls, would be subject to occasional postural limitations in bending, kneeling, and climbing, could perform work at an SVP of three or less, and could only occasionally deal with the general public. [AR 30] The ALJ concluded that the "evidence since [Plaintiff's] back surgery supports a finding that [Plaintiff] is limited to work at the sedentary exertional level." [*Id.*]

The ALJ went on to determine that the demands of Plaintiff's past relevant work exceeded his current RFC (Step Four), and that prior to March 3, 2011, considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy. [AR 30-31] However, the ALJ found that beginning on March 3, 2011, considering Plaintiff's age, education, work experience and RFC, there were no jobs existing in significant numbers in the national economy that Plaintiff could perform. [AR

32]  As a result, the ALJ concluded that prior to March 3, 2011, Plaintiff was not disabled at Step

Five of the sequential process and, therefore, was not under a disability as defined by the SSA,

but on March 3, 2011, Plaintiff became disabled and continued to be disabled through the date of

the ALJ's decision.  [AR 31-32]

On May 3, 2012, Plaintiff sought review of the ALJ's decision by the Appeals Council.

[AR 248]  On September 26, 2013, the Appeals Council notified Plaintiff that it had determined

it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the

final decision of the Commissioner of Social Security."  [AR 1-3]  Plaintiff timely filed his

Complaint in this matter on November 27, 2013.  *See* Complaint, docket #1.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to properly weigh the

opinion evidence of the disabling effects of Plaintiff's condition prior to March 3, 2011; (2) the

ALJ's decision regarding Plaintiff's RFC between October 27, 2009, and March 3, 2011 is not

supported by substantial evidence; (3) the ALJ erred by failing to comply with the Appeals

Council's order of remand when, at the March 15, 2012 hearing, he refused to allow Plaintiff to

develop the record regarding the differences between his condition before and after March 3,

2011, and when he failed to reevaluate the evidence of Plaintiff's functional limitations prior to

March 3, 2011; and (4) even if the RFC the ALJ assigned to Plaintiff prior to March 3, 2011 is

not erroneous, the ALJ erred in finding that Plaintiff could perform the jobs of brake adjustor and

housekeeping/cleaner.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

I.    **Whether the ALJ Failed to Properly Weigh the Opinion Evidence of the Disabling Effects of Plaintiff's Condition Prior to March 3, 2011**

Plaintiff argues that the ALJ incorrectly declined to give weight to the opinion of his treating physician Dr. Higgins or the findings of Dr. Borja and instead relied too heavily on the findings of Dr. LoGalbo.[2]  Opening Brief, docket #13 at 15-16.  Plaintiff explains that under 20 C.F.R. §§ 404.1527(c) and 416.927(c), "the opinion of a treating physician concerning the nature and extent of a [Plaintiff's] disability is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [Plaintiff's] case record." *Id.* at 16.  Plaintiff then argues that the ALJ did not consider the weighing opinion factors set in forth in 20 C.F.R. §§404.1527 and 416.927 in order "to largely credit the only physical functional capacity opinion that was not derived from, at the least, a thorough examination of [Plaintiff], and the only opinion that would not lead to an award of benefits between [Plaintiff's] alleged onset date of October 27, 2009 and March 3, 2011." *Id.* at 17.  Plaintiff further posits that if, arguendo, Dr. Higgins' treating source opinion was not supported by the record, the ALJ did not then provide sufficient detailed findings on the lack of weight given to Dr. Higgins' and Dr. Borja's opinion. *Id.*  Defendant counters by arguing that Dr. Higgins' opinion was contradicted by his own treating notes and Dr. Borja's opinion.  Response Brief, docket #16 at 10.  Further, Defendant argues that the ALJ did not err in affording Dr. Borja's opinion little weight based on the time Dr. Borja spent with Plaintiff and the inconsistencies with the record as a whole. *Id.* at 11.  Finally, Defendant argues that even if there is a possibility Plaintiff's argument should be endorsed, it does not overcome the ALJ's finding by substantial evidence. *Id.* at 12.

---

[2] In actuality, the ALJ gave "little weight" to Dr. Borja's opinion, not "no weight" as claimed by Plaintiff.  [AR 29]

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 416.927(c)(1).  In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive—that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 416.927(d)(2). Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case

record. SSR 96-2p, 1996 WL 374188, at *2.

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300; *see also Mays*, 739 F.3d at 574.   At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.   If this is not done, remand is mandatory. *Id.*  As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4).   Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis"). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors

brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.   In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion."  *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).  Without these findings, remand is required.  *Watkins*, 350 F.3d at 1300-01; *accord Krauser*, 638 F.3d at 1330.  Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so.  *Watkins*, 350 F.3d at 1301.

Under the two-step inquiry dictated in *Krauser*, in giving no weight to Dr. Higgins' opinion, the ALJ by default did not give controlling weight.  Further, as the ALJ explained, Dr. Higgins' opinion is contrary to Plaintiff's own self-reports of his capabilities.  [AR 28]  Dr. Higgins' report stated that Plaintiff could never lift or carry above ten pounds, would only be able to sit, stand, or walk for one hour during an eight hour workday, and Plaintiff did not retain the ability to hear and understand simple oral instructions, nor communicate simple information. [AR 440-444]  Further, Dr. Higgins noted that Plaintiff could care for his personal hygiene, but could not perform activities like shopping, could not prepare a simple meal for himself, or travel without a companion for assistance.  [*Id.*]  Plaintiff himself stated in a function report on January 28, 2010 that he goes outside once or twice a day, vacuums, washes dishes, cleans his bathroom, prepares his own meals, and shops for groceries in a store twice a month for one to one-and-a-half hours.  [AR 300-302]

Additionally, Dr. Borja's functional assessment in her "Consultative Exam Report" materially differed from the opinion of Dr. Higgins.  In an eight-hour workday, Dr. Borja stated that Plaintiff should be able to stand or walk for four hours and sit for four hours with frequent

breaks.  [AR 367]  Dr. Higgins stated that Plaintiff's postural limitations included bending, squatting, crouching, or stooping frequently, and manipulative limitations included reaching, pulling, pushing, and grasping.  [*Id*.]  Overall, since Dr. Higgins' opinion was inconsistent with the other substantial evidence in Plaintiff's case record, the ALJ was correct in not giving controlling weight to Dr. Higgins' opinion.

At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned."  *Krauser*, 638 F.3d at 1330.  In giving no weight to Dr. Higgins' medical assessment of ability to do work-related activities, the ALJ states that the "severity of the limitations espoused by Dr. Higgins would indicate that [Plaintiff] is bedridden, which he is not.  The undersigned can give no weight to this opinion as it is contrary to the objective medical evidence of record and the [Plaintiff's] own self-reports of his capabilities."  [AR 28]

The ALJ makes clear how much weight is being given to Dr. Higgins' opinion, but the justifications are lacking.  First, the ALJ appears to inject personal opinion in stating that Dr. Higgins' opinion would mean that Plaintiff should be bedridden.  [*Id*.]  Nowhere in any of Dr. Higgins' opinion or medical records does it mention that Plaintiff is or should be bedridden. [AR 440-468]  The ALJ then states that he "can give no weight to this opinion as it is contrary to the objective medical opinion and [Plaintiff's] own self-reports of his capabilities."  [AR 28] This does not meet the standard set in *Krauser* because it does not mention, nor appear to consider, any of the factors specified in cited regulations and, therefore, remand to explain the reasoning for assigning no weight to Dr. Higgins' opinion is required.

Plaintiff next claims that the ALJ did not provide sufficient explanation of his decision to

give Dr. Borja's opinion no weight, yet agree with Dr. LoGalbo's opinion in part.  Opening

Brief, docket #13 at 17.  "Examining source opinion[s] may be dismissed or discounted based on

an evaluation of the factors set out in 20 C.F.R. §§ 404.1527 and 416.927, and the ALJ must

provide specific and legitimate reasons for rejecting it."  *Chapo v. Astrue* 682 F.3d 1285, 1291

(10th Cir. 2012).  The ALJ indeed gave little weight to Dr. Borja's opinion, but merely stated

that he "reviewed the evidence and [Plaintiff's] activities of daily leaving and notes that

[Plaintiff] has a fairly active lifestyle and the limitations suggested by Dr. Borja are not borne out

by the longitudinal medical history of the [Plaintiff]…"  [AR 29]  The ALJ notes the activities

Plaintiff states he can do earlier in his opinion.  [AR 26-27]  However, the ALJ makes no

specific references to what in the longitudinal medical history he is referring, and cites no

specific factors upon which he relied.  Further, the ALJ gives the most (albeit "partial") weight to

a non-examining medical source, Dr. LoGalbo.  [AR 29]  Again, there is no specific reference to

the cited factors in the ALJ's weighing of Dr. LoGalbo's decision.

> In the absence of findings by the ALJ revealing the ALJ's specific weighing of
> the evidence, this Court cannot assess whether substantial evidence supported the
> ALJ's RFC finding … or if he applied the correct legal standards.  This Court
> cannot simply presume the ALJ applied the correct legal standards, nor itself
> weigh the opinion evidence present in plaintiff's case record.

*Nagelschneider v. Astrue*, 617 F. Supp 1115, 1119 (D. Colo. 2009) (internal citations and

quotation marks omitted); *accord Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996); *see*

*Watkins*, 350 F.3d at 1301.  The Court must remand the case for further consideration of the

justifications for the weight given to Dr. Higgins', Dr. Borja's, and Dr. LaGalbo's opinions.

## II.   Whether the ALJ's Decision Regarding Plaintiff's RFC between October 27, 2009 and March 3, 2011 is not Supported by Substantial Evidence

Plaintiff's also argues the ALJ's conclusions that Plaintiff could perform work at the light

exertional level and had a "fairly active lifestyle" are not supported by substantial evidence.

Opening Brief, docket #13 at 19.  Plaintiff acknowledges the daily activities the ALJ cites that the Plaintiff said he can perform, but argues that other evidence in the record overwhelms these actions such that a finding of Plaintiff's ability to perform work at the light exertional level between October 27, 2009, and March 3, 2011 is incorrect.  *Id*. at 20.  Plaintiff primarily relies upon *Broadbent v. Harris*, 698 F.2d 407 (10th Cir. 1983) as an example of a case where a court found evidence in the record that overcame a plaintiff's own words in finding he was disabled. *Id*.  *Broadbent* is distinguishable for a variety of reasons.  First, while the *Broadbent* court agreed that the plaintiff "admitted to working in his yard, performing a few household tasks, working on cars, taking an occasional trip with his brother in a camper, and on one occasion, driving to California to pick up his children who had run away from home[, i]t is clear from the record that these activities were not conducted on a regular basis and did not involve prolonged physical activity." *Broadbent*, 698 F.2d 407 at 413.  Plaintiff here does not note the frequency of the activities.  Second, *Broadbent* was not remanded on this issue, but rather on the court questioning how the ALJ relied so heavily on the decision of one doctor without giving more weight to the six specialists who treated plaintiff on a continuing basis. *Id.* at 414.

The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman*, 511 F.3d at 1272 (citing *Casias*, 933 F.2d at 800).  Considering the cases cited by Plaintiff and the record as a whole, the Court finds that the ALJ properly determined Plaintiff's exertional level between October 27, 2009, and March 3, 2011.  However, the ALJ must reconsider the entire RFC if there are changes to the weight given to the doctors mentioned above upon remand pursuant to the five-step sequential evaluation process in C.F.R. § 404.1520.

**III.   Whether the ALJ Erred by Failing to Comply with the Appeals Council's Order of Remand when, at the March 15, 2012 Hearing, he Refused to Allow Plaintiff to Develop the Record regarding the Differences between his Condition Before and After March 3, 2011, and when the ALJ Failed to Reevaluate the Evidence of Plaintiff's Functional Limitations Prior to March 3, 2011**

Plaintiff's third argument makes two claims relating to the hearing held pursuant to the remand required by the Appeals Council on March 15, 2012.  First, Plaintiff argues that the ALJ did not allow Plaintiff and his counsel to develop the record before March 3, 2011.  Opening Brief, docket #13 at 20-22.  Essentially, Plaintiff argues that the ALJ erred when he did not allow Plaintiff and his counsel to discuss Plaintiff's ability to lift before and after the spinal fusion surgery and, presumptively, that the ALJ would then not allow Plaintiff to further develop the record on any issue before March 3, 2011.  *Id.*; [AR 49]  When Plaintiff's counsel attempted to talk about Plaintiff's ability to lift before surgery, the ALJ responded that "No, we won't talk about before the surgery. We've already talked about that. You may not have been here, but [Plaintiff] and I were."  [AR 49]  With this, Plaintiff argues that the ALJ did not comply with the remand order when he did not provide specific references of record related to the reconsideration of Plaintiff's RFC.  Opening Brief, docket #13 at 22.  Defendant counters by arguing that the ALJ was acting within his discretion when he did not allow the prior evidence on the March 15, 2012 hearing because he had already allowed the evidence at a more appropriate time (the first hearing which occurred on January 14, 2011).  Response Brief, docket #16 at 16-17.  Further, Defendant argues that Plaintiff and his counsel had the right to object and chose not to at that time.  *Id.*

ALJs are not required to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning.  *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (quoting *Hawkins v. Chater,* 113 F.3d 1162, 1168 (10th Cir. 1997)).  As such, an ALJ is

generally entitled to "rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Id.* (quoting *Branum v. Barnhart,* 385 F.3d 1268, 1271 (10th Cir. 2004)).   However, the ALJ has a duty, even where a claimant is represented by counsel, to adequately develop the record. *Longgrear v. Colvin*, 26 F. Supp. 3d 1066, 1072 (D. Colo. 2014); *see Hawkins* 113 F.3d at 1164; *Henrie v. Dep't Health & Human Servs.,* 13 F.3d 359, 360-61 (10th Cir. 1993).   The Commissioner bears an affirmative duty to develop the record. *Vigil v. Astrue*, 803 F. Supp. 2d. 1271, 1275 (D. Colo. 2011).

Among other issues, the remand ordered the ALJ to "obtain updated evidence concerning [Plaintiff]'s degenerative lumbar disc disease status post anterior lumbar fusion and affective disorder … in accordance with the regulatory standards regarding consultative examinations and existing medical evidence, and "[g]ive further consideration to [Plaintiff]'s maximum [RFC] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." [AR 136]  The ALJ indeed gathered updated evidence related to lumbar disc disease, shown in the evidence to which he cites when finding Plaintiff disabled past March 3, 2011. [AR 30, ¶ 6]  This same paragraph is a justification, including citations to the record, of a new RFC. [*Id.*]

Plaintiff argues that the "further consideration" to be given on remand to Plaintiff's RFC requires that the ALJ reconsider evidence from prior to March 3, 2011, but there is no merit to Plaintiff's argument because the remand order does not specifically state such requirement.  The Court finds that the "further consideration" refers to the new information post-March 3, 2011, and such information was considered and cited to by the ALJ.  [AR 30, ¶ 6]  Further, during the hearing, Plaintiff's counsel attempted to bring up evidence from a time period that had already been considered by the ALJ.  At the point the ALJ curtailed this discussion, Plaintiff and his

counsel could have objected on the issue had they deemed it necessary to do so.  Despite the inaction, the affirmative duty to develop the record means the ALJ must further inquire when necessary, but the Court finds that it was not specifically necessary to do so in this circumstance. Therefore, the Court finds that the ALJ did not err when he did not allow Plaintiff to testify regarding the time period prior to March 3, 2011.

**IV.    Whether the ALJ Erred in Finding that Plaintiff Could Perform the Jobs of Brake Adjustor and Housekeeping/Cleaner**

Plaintiff's final argument is that there was a "conflict by omission" between Plaintiff's RFC and the job descriptions set forth in the *Dictionary of Occupational Titles* ("DOT"). Opening Brief, docket #13 at 24.  Plaintiff explains that none of the job titles in the DOT or its supplemental documents address the need to use a cane to ambulate in the same way the ALJ described in his RFC assessment.  *Id*.  While Plaintiff concedes that the ALJ included the requirement of using a cane to ambulate in the ALJ's hypothetical presented to the Vocational Expert ("VE"), he states that there was "no evidence elicited about how the use of a cane would affect the performance of these jobs, and the ALJ made no findings of fact regarding this."  *Id*. Plaintiff then argues that a review of the DOT listings for the recommended jobs shows that the use of a cane would make a number of duties difficult, if not impossible, to perform.  *Id*. Finally, Plaintiff states that the ALJ was required to investigate conflicts between the actual availability of the DOT listed jobs once the requirement of using a cane to ambulate was considered.  *Id*. at 24-25.  Defendant counters that the VE testified that the jobs mentioned were "generally compatible" with their description in the DOT.  Response Brief, docket #16 at 18. Defendant further states that the relevant SSR only elicits an explanation from a VE when there is an apparent unresolved conflict between the VE and the DOT, and in this case there was no apparent unresolved conflict.  [*Id*.]; SSR 00-4p, 2000 WL 1898704.  Therefore, Defendant

argues that the ALJ was not required to provide explanation or additional evidence. Response Brief, docket #16 at 18. Finally, Defendant argues that the VE responded with an appropriate job in response to a hypothetical that involved an individual using a cane and lifting no more than ten pounds with his non-dominant hand. *Id.*

At Step Five of the sequential process, an ALJ bears the burden "to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found [the claimant] to have." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Specifically,

> the ALJ must find that the claimant retains particular exertional [and non-exertional] capacit[ies], decide whether the claimant has acquired transferable skills, identify specific jobs that the claimant can perform with the restrictions the ALJ has found the claimant to have, and verify that the jobs the claimant can do exist in significant numbers in the regional or national economies. All of these findings must be supported by substantial evidence.

*Id.* at 1088-89; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005). "Determining 'the functional demands and job duties' of specific jobs and matching those requirements to a claimant's limitations is the very task the ALJ must undertake at Step Five." *Haddock*, 196 F.3d at 1090. Accordingly, an ALJ may rely on the testimony of VEs and/or reliable publications, such as the DOT. *Id.* "Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within the ALJ's duty to develop the record." *Id.* at 1091. Thus, "[a]n ALJ must investigate and elicit a reasonable explanation for any conflict between the [DOT] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Id.*; *see also Krueger v. Astrue*, 337 F. App'x 758, 761-62 (10th Cir. 2009) (the ALJ committed reversible error by failing to ask the VE to reconcile a conflict between the expert's testimony and the definitions of certain jobs in the DOT).

Regarding the suggested jobs, the Court agrees with Defendant that an unresolved conflict did not exist between descriptions in the DOT and the VE's testimony and, therefore, the ALJ was not required to making findings of fact.  Courts have found that an ALJ does not err when using a VE's opinion testimony that the jobs he identified were consistent with a hypothetical person having a claimant's impairments and the DOT description.  *Thompson v. Colvin*, 551 F. App'x 944, 949 (10th Cir. 2014); *cf. Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009) (holding that "[b]ecause there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless).  The "conflict by omission" proffered by Plaintiff lacks merit because the concession Plaintiff makes is sufficient to resolve Plaintiff's concern.  The ALJ directly added the use of a cane to ambulate in his hypothetical in the first hearing, and then referred to that in the second hearing.  [AR 62, 83]  The VE then confirmed that the jobs mentioned were generally compatible with their DOT descriptions.  [AR 84]  The Court does not evaluate in the first instance whether a claimant is able to perform specific jobs. *Thompson*, 551 F. App'x at 949; *see, e.g., Raymond v. Astrue,* 621 F.3d 1269, 1271 (10th Cir. 2009) (appellate court's review of agency's factual findings is limited to whether they are supported by substantial evidence in the record).  Therefore, the Court finds that the ALJ did not commit error when he did not elicit any further evidence about how the use of a cane might affect Plaintiff's performance of the jobs of brake adjustor and housekeeper/cleaner.

## CONCLUSION

In sum, the Court concludes that the ALJ failed to fully explain the justifications for the weight given to Dr. Higgins', Dr. Borja's, and Dr. LaGalbo's opinions. Conversely, the Court finds that the ALJ properly determined Plaintiff's exertional level between October 27, 2009,

and March 3, 2011, but must reconsider Plaintiff's RFC between October 27, 2009, and March 3, 2011 if the ALJ finds that the weights of Dr. Higgins', Dr. Borja's, and Dr. LaGalbo's opinions change once sufficient justification is provided.  Further, the ALJ did not err when he prevented Plaintiff from testifying regarding the time period prior to March 3, 2011.  Finally, the ALJ did not commit error when he did not elicit any further evidence about how the use of a cane might affect Plaintiff's performance of the jobs of brake adjustor and housekeeper/cleaner.  Upon remand, the Court directs the Commissioner to reconsider the ALJ's decision in light of the stated deficiencies.

Therefore, the decision of the ALJ that Plaintiff James A. Joe was not disabled prior to March 3, 2011 is **affirmed in part, reversed in part, and remanded** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 15th day of July, 2015.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge